George Haines, Esq.
Nevada Bar No. 9411
Gerardo Avalos, Esq.
Nevada Bar No. 15171
**FREEDOM LAW FIRM**
8985 S. Eastern Ave., Suite 350
Las Vegas, NV 89123
Tele. 702.880.5554
E-fax: 702.967.6666
Email: info@freedomlegalteam.com
*Attorneys for Plaintiff Amanda Davis*
*and on behalf of all others similarly situated*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| Amanda Davis, individually and on behalf of all others similarly situated,<br><br><br>Plaintiff,<br><br>-vs.-<br><br><br>American Education Services LLC., KeyCorp Financial, Inc. dba KeyBank.<br>Defendants. | CASE NO. 2:22-cv-01645<br><br>**CLASS ACTION**<br><br>**Complaint for Damages Based on: (1) The Fair Credit Reporting Act, 15 U.S.C. §§ 1681, et seq.; (2) Unjust Enrichment; (3) Bankruptcy Discharge Injunction violations under 11 U.S.C. § 524(a)(2); and (4) Violation of The Nevada Deceptive Trade Practices Act NRS 598 et seq. (NDTPA), Constituting "Consumer Fraud" Under NRS 41.600 et seq.**<br><br>**Jury Trial Demanded**<br><br>**Exempt from Arbitration** |

1

**INTRODUCTION**

1.      The United States Congress has found the banking system is dependent upon fair and accurate credit reporting.  Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. Congress enacted the Fair Credit Reporting Act, 15 U.S.C. §§1681 et seq. ("FCRA"), to insure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy. The FCRA seeks to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other information on consumers.  The FCRA also imposes duties on the sources that provide credit information to credit reporting agencies, called "furnishers."

2.      There exists today in the United States a pervasive and fundamental misunderstanding about the long term impact filing a consumer bankruptcy has on a consumer's credit worthiness. Specifically, many consumers believe that because a bankruptcy can be reported on their credit report for ten years their credit worthiness will be ruined for the same length of time. This is not true.

3.      The majority of consumer debtors who actually file consumer bankruptcy do so to raise their credit score and remedy their poor credit worthiness.

4.      It is entirely possible for consumer debtors to have over a 700 Fico Score within as little as 12 months after filing a consumer bankruptcy (Chapter 7 or Chapter 13).

5.      Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys a consumer's credit worthiness for ten years.

6.      In an effort to perpetuate the aforementioned bankruptcy myth, creditors intentionally and routinely ignore credit reporting industry standards for accurately reporting

bankruptcies and debts included in those bankruptcies in an effort to keep consumers' credit scores low and their interest rates high.

7.     Creditors know that by deviating from recognized credit reporting standards consumers will have difficulty raising their credit scores and improving their credit worthiness.

8.     In addition, there is also the bankruptcy myth that education loan cannot be discharged in bankruptcy.

9.     However, some private loans for educational purposes can be discharged in a normal bankruptcy proceeding, just like most other consumer debts.  According to the Consumer Financial Protection Bureau[1], these loans could include, for example:

- **Loans where the loan amount was higher than the cost of attendance (such as tuition, books, room, and board), which occurs when a loan is paid directly to a consumer;**
- **Loans to pay for education at places that are not eligible for Title IV funding such as unaccredited colleges, a school in a foreign country, or unaccredited training and trade certificate programs;**
- **Loans made to cover fees and living expenses incurred while studying for the bar exam or other professional exams;**
- **Loans made to cover fees, living expenses, and moving costs associated with medical or dental residency; and**
- **Loans to a student attending school less than half-time.**

10.     Amanda Davis ("Plaintiff") brings this Class Action Complaint for damages, injunctive relief, and any other available legal or equitable remedies on behalf of herself and all others similarly situated (the "Class"), resulting from the illegal actions of American Education Services LLC., ("AES") and KeyCorp Financial, Inc. dba KeyBank ("KeyBank") (together as "Defendants"), in negligently or intentionally systematically reporting derogatory, misleading, and inaccurate information on consumers' credit reports, as that term is defined by 15 U.S.C. §

---

[1] https://www.consumerfinance.gov/about-us/blog/busting-myths-about-bankruptcy-and-private-student-loans/.

1681a(g), failing to properly investigate disputes concerning the inaccurate data Defendants are reporting in consumers' credit files, and failing to correct such, which Defendants knew or should have known was erroneous and which caused the Class damages.

11.     Plaintiff makes these allegations on information and belief, with the exception of allegations that pertain to Plaintiff, which Plaintiff alleges on personal knowledge.

12.     While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

13.     Any violations by Defendants were knowing and intentional, and Defendants did not maintain procedures reasonably adapted to avoid any such violation.

14.     Unless otherwise indicated, the use of Defendants names in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of the named Defendants.

15.     Unless otherwise stated, all the conduct engaged in by Defendants occurred Nationwide.

## JURISDICTION AND VENUE

16.     Jurisdiction of this Court arises pursuant to 28 U.S.C. §1331; 15 U.S.C. § 1681p; and, 28 U.S.C. § 1367 for supplemental state claims.

17.     This Court has personal jurisdiction over Defendants through their business operations in this District, the specific nature of which occurs in this District. Defendants intentionally avail themselves of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to this action occurred in this District, and because Plaintiff resides in this District.

///

///

**PARTIES**

19.     Plaintiff is a natural person residing in Clark County, Nevada. In addition, Plaintiff is a "consumer" as that term is defined by 15 U.S.C. § 1692a(3) and 15 U.S.C. § 1681a(c).

20.     Defendants are corporations doing business in the State of Nevada.

21.     Defendants are furnishers of information as contemplated by FCRA sections 1681s-2(a) & (b), which regularly and in the ordinary course of business furnish information to one or more Consumer Reporting Agencies ("CRAs"), about consumer transactions or experiences with any consumer.

**GENERAL ALLEGATIONS REGARDING PLAINTIFF'S BANKRUPTCY**

22.     Sometime in 2005, Plaintiff enrolled at College of St Rose for a Teacher Education Baccalaureate program ("St. Rose").

23.     Plaintiff paid for her cost of attendance at St. Rose with federal student loan funds.

24.     Plaintiff also borrowed approximately $10,752.68 in private student loans from Defendants to pay for living expenses while attending St Rose. All or some of these funds were paid directly to Plaintiff.

25.     Because Plaintiff's cost of attendance was covered by federal student loan funds, the private student loans from Defendants necessarily included funds in excess of the cost of attendance, making them "mixed-use" loans and not "qualified education loans." See 26 U.S.C. 221(d)(1); 26 C.F.R. 1.221-1(e)(4) (Defining mixed-use and qualified education loans with examples).

26.     On or about November 16, 2018, Plaintiff filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the District of Nevada pursuant to 11 U.S.C. §1301 et seq. (the "Bankruptcy").

27.     The obligations to Defendants were scheduled in the bankruptcy and Defendants received notice of the bankruptcy.

28.     Further, while the "automatic stay" was in effect during the Bankruptcy, it was illegal and inaccurate for Defendants to report any post-Bankruptcy derogatory collection information, which was inconsistent with the Orders entered by the Bankruptcy Court, including the initial Petition for Relief for Bankruptcy protection (the "Petition").

29.     Defendants did not file any proceedings to declare their alleged debts "non-dischargeable" pursuant to 11 U.S.C. § 523 et seq.

30.     Defendants also did not request relief from the "automatic stay" codified at 11 U.S.C. §362 et seq., which prohibits creditors included in a consumer's bankruptcy from engaging in collection activities, while the Plaintiff's Bankruptcy was pending to pursue the Plaintiff on any *personal* liability for any of the underlying Debts.

31.     On or about February 26, 2019, Plaintiff received a bankruptcy discharge under 11 U.S.C. § 727.

32.     Just like most of Plaintiff's consumer debts, her private student loans were discharged in her bankruptcy proceeding.

33.     Since Plaintiff's bankruptcy discharge, Defendants have continued to report the private student loan debt on her credit report in "current" status with a current balance that is still due and owing.

34.     The representations that the debt on the private student loans is due and owing are false and misleading as Plaintiff does not owe a debt to Defendants.

35.     Due to Defendant's continued reporting of the private student loan debt as due and owing, Plaintiff has continued to make payments on the discharged debt in an effort to remove the negative reporting from her credit report.

36.     As a result of Defendants' unlawful credit reporting, Plaintiff has experienced emotional distress resulting from the stress, anxiety, fear, anger, and frustration she continues to experience arising out of the actions complained of herein.

///

**FACTS COMMON TO SIMILARLY SITUATED PLAINTIFFS**

37.    As a matter of policy and practice, Defendants regularly and consistently fail to engage in any efforts to ensure the debts upon which they attempt to collect are not subject to a bankruptcy discharge.

38.    Defendants' actions in failing to identify and eliminate discharged debts constitute their standard procedure for conducting their debt collection activities.

39.    Despite being fully aware of their legal obligations under federal and state debt collection laws, Defendants continuously breach those obligations.

40.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action individually and on behalf of a class initially defined as:

National Class: All persons whose "private student loans" were incurred prior to them filing bankruptcy and then these loans were subsequently discharged in their bankruptcy, but Defendants have continued to collect on these debts as if the "student loans" were not discharged in bankruptcy.

Nevada Class: All residents of Nevada whose "private student loans" were incurred prior to them filing bankruptcy and then these loans were subsequently discharged in their bankruptcy, but Defendants have continued to collect on these debts as if the "student loans" were not discharged in bankruptcy.

41.    Excluded from the Classes are Defendants' officers and directors; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

42.    Plaintiff reserves the right to amend the definitions of the Classes or add a Class if further information and discovery indicate that the definitions of the Classes should be narrowed, expanded, or otherwise modified.

43.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

44.   <u>Numerosity</u>.  The members of the Classes are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of thousands of Defendants' customers whose "private student loans" were incurred prior to them filing bankruptcy and then these loans were subsequently discharged in their bankruptcy

45.   <u>Commonality</u>. There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a)   Whether Defendants have continued to report these loans to consumer reporting agencies as due and owing even though the individual's "private student loans" were incurred prior to them filing bankruptcy and were subsequently discharged in their bankruptcy; and

b)   Whether Defendants have continued to collect on these debts even though the "private student loans" were incurred prior to Plaintiff and class members filing for bankruptcy and then these loans were subsequently discharged in their bankruptcy.

46.   <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff, like every other Class Member, also took out "private student loans" that were discharged in bankruptcy.

47.   <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the members of the Classes. Plaintiff's Counsel is competent and experienced in litigating class actions.

48.   <u>Predominance</u>. Defendants have engaged in a common course of conduct toward Plaintiff and Class Member by seeking to collect debt from them when their "private student loans" were discharged in bankruptcy. The common issues arising from Defendants' conduct affecting

Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

49.     <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most class members would likely find that the cost of litigating their individual claims is prohibitively expensive and would therefore have no effective remedy. Thus, Defendants would retain the benefits of their wrongdoing despite their serious violations of the law.

50.     The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each class member.

51.     Defendants have acted on grounds that apply generally to the Classes as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

52.     Class certification, therefore, is appropriate pursuant to Rule 23 because the common questions of law or fact predominate over any questions affecting individual Class Members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## GENERAL CREDIT REPORTING INDUSTRY ALLEGATIONS

### a. FICO Scores

53.     FICO Inc. ("FICO") is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.

54.     The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.

55.     The three largest CRA's, Equifax, Experian, and Trans Union all rely on FICO's analytics software to evaluate and/or furnish consumer credit information.

56.     A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

57.     Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

58.     Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

59.     There are 28 FICO Scores that are commonly used by lenders.

60.     A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at CRAs.

61.     FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.

62.     There are five key factors that a FICO Score considers: 1) Payment history; 2) Amount of Debt; 3) Length of Credit History; 4) New Credit; and 5) Credit Mix.

63.     Each of the five factors is weighted differently by FICO.

64.     35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.

65.    Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score.

66.    Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

67.    In factoring the severity of delinquent payments a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist.

68.    Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.

69.    FICO Scores are entirely dependent upon information provided by Data Furnishers ("DFs") to CRAs.

70.    The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both "Chapters" have the same level of severity with respect to their FICO Score and for both, FICO uses the FILING DATE to determine how long ago the bankruptcy took place.

**b. Metro 2 Format**

71.    The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.

72.    The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumers' credit history.

73.     The Consumer Data Industry Association's ("CDIA") Metro 2 format is the credit industry's standardized, objective reporting format used by furnishers to provide information about consumer accounts to consumer reporting agencies.[2]

74.     Therefore, the credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.

75.     The CDIA is he expert on accurate credit reporting. In support of this allegation, Plaintiff avers the following:

    a.   The CDIA offers an FCRA certificate program for all CRAs.

    b.   The CDIA offers an FCRA awareness program for all CRAs.

    c.   The CDIA offers an FCRA certificate program for DFs.

    d.   The CDIA offers an FCRA awareness program for DFs.

    e.   The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.

    f.   The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Trans Union.

    g.   The CDIA developed a credit reporting resource guide for accurately reporting credit.

76.     The CDIA's Metro 2 is accepted by all CRAs.

77.     The CDIA publishes the Metro 2 reporting standards to assist furnishers with their compliance requirements under the FCRA.

78.     Courts rely on such guidance to determine furnisher liability. *See, e.g., In re Helmes*, 336 B.R. 105, 107 (Bankr. E.D. Va. 2005) (finding that "industry standards require that a

---

[2] *See* Consumer Financial Protection Bureau, Key Dimensions and Processes in the U.S. Credit Reporting System, available at:
http://files.consumerfinance.gov/f/201212_cfpb_credit-reporting-white-paper.pdf

debt discharged in bankruptcy be reported to a credit reporting agency with the notation `Discharged in bankruptcy' and with a zero balance due").

79.   The credit reporting industry standards for reporting Metro 2 accurately are found in the CDIA's Credit Reporting Resource Guide ("CRRG").

80.   The CRRG outlines the industry standards for accurately reporting debts using Metro 2.

81.   The CRRG is not readily available to the public. It can be purchased online for approximately $229.45.

82.   Even if a buyer is ready and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

83.   When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.

84.   The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

85.   If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk, resulting in less favorable lending terms.

86.   E-OSCAR is the web based Metro 2 compliant system developed by the CRAs that enables DFs and CRAs to create and respond to consumer credit disputes.

87.   When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-Oscar to the DF.

88.   The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file, e.g. "Account Type - 07" (07 in Metro 2 refers to a Charge Account).

89.   When a consumer files bankruptcy, certain credit reporting industry standards exist.

90.     Certain Metro 2 data is regularly inspected and calculated by FICO when determining a consumer's credit worthiness.

91.     The Consumer Information Indicator ("CII") is a critical *status* field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.

92.     Under Metro 2, the CII must be reported only on the consumer to whom the information applies.

93.     It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

94.     In the consumer bankruptcy context, CII Metro Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.

95.     Such a reporting alerts any potential lender that the account is no longer in a collectable status, but is rather being handled by a Chapter 7 trustee.

96.     The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

97.     The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.

98.     The lack of a CII reported status makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

99.     The lack of a CII reported also suggests that creditors are free to collect against a consumer as an individual or that no stay or discharge exists to prevent *in personam* collection activity.

100.    Therefore, failure to report the correct CII status indicator will prompt those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

101.    Under the FCRA, a bankruptcy can be reported for ten years.

102.    The ten-year rule for reporting runs from the date the bankruptcy was filed.

103.    A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

104.    The more time that has passed since the filing of the bankruptcy, the less negative impact the bankruptcy will have on a consumer's FICO Score.

105.    Failure to reference the bankruptcy filing and/or discharge (CII field) results in a lower FICO Score which, in turn, results in those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

106.    On information and belief, Defendants adopted the Metro 2 reporting standards and at all times relevant implemented the Metro 2 format as an integral aspect of its respective duties under the FCRA to have in place adequate and reasonable policies and procedures to handle investigations of disputed information.

## GENERAL CLASS ACTION ALLEGATIONS

107.    Both the proposed National Class and the proposed Nevada Subclass will be collectively referred to as the Class except where it is necessary to differentiate them.

108.    Plaintiff is among many thousands of persons in the United States who have filed bankruptcies pursuant to Chapters 7 and 13 of the U.S. Bankruptcy Code and who have been granted orders of discharge by a U.S. Bankruptcy Court. Under federal bankruptcy laws, such an order fully and completely discharges all statutorily dischargeable debts incurred prior to the filing of bankruptcies, except for those that have been: (1) reaffirmed by the debtor in a reaffirmation agreement; or (2) successfully challenged as non-dischargeable by one of the creditors in a related adversary proceeding. Plaintiff and the Class Members are persons for whom the debts at issue have been discharged through bankruptcy.

109.    Defendants are creditors who regularly engage in the business of loaning money to students like Plaintiff and other members of the Class.

110.    In the ordinary course of business, Defendants' debtors who are enduring financial hardship fall behind on their payments of Defendants accounts. Prior to the filing of any personal

bankruptcies, Defendants, their collection agencies and delinquent debt companies that purchase Defendants' debt, act to collect these past due debts by threatening in dunning letters to place a "charge off" or other similar "past due" notations on the debtors' credit reports. Said letters threaten to ruin the debtors' credit unless they pay the past due debt. Defendants, their debt collectors and delinquent debt companies that purchase Defendants' debt also act to collect these past due debts by promising in dunning letters to remove the "charge off" or other "past due" notations on the debtors' credit reports to show that the past due debts have been paid if the debts are paid.

111.    In the ordinary course of business, Defendants furnish information to credit reporting agencies relating to the current status of debts incurred by individuals whom Defendants have extended credit. Defendants are also an entities which regularly and, in the ordinary course of business, furnish information to one of more credit reporting agencies about their transactions and experiences with consumers.

112.    Defendants have knowledge of when their past due debts are discharged because they receive a discharge notice from the U.S. Bankruptcy Court.

113.    Despite the fact that Defendants have received notice of the discharge of each Class Member's debt to Defendants, Defendants have a deliberate policy of not notifying credit reporting agencies that debts formerly owing to Defendants are no longer "Open," "charged off," or currently still due and owing because they have been discharged in bankruptcy.

114.    As a result of Defendants' refusal to make such updates to credit reporting agencies, debts that have been discharged in bankruptcy are instead listed on Class Members' credit reports as "current," "open," "past due," and/or "charged off." These notations clearly indicate to potential creditors, employers, or other third parties that a Class Member still owes a debt and that debt may be subject to collection. These notations therefore adversely affect a Class Member's ability to obtain credit or employment and have the inherent coercive effect of inducing Class Members to make payments on the discharged debt.

115.     Moreover, Defendants' failure and further refusal to update credit report tradelines for many thousands of consumers to reflect that their debts were, in fact, discharged in Bankruptcy runs afoul of Section 727 of the Bankruptcy Code and the primary purpose of the protection offered by the Bankruptcy Code: The discharge of a debt. *See Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007).

116.     Many consumers whose debts have been discharged in bankruptcy have advised Defendants, via FCRA disputes, of their failure to update the information on their credit reports to show that their debts have been discharged through bankruptcy. Said consumers have requested that Defendants remove the "current," "open," "charged off," and "past due" statuses from their credit reports. Defendants have refused to do so, and in fact, often verify their reporting as accurate to the CRA's leading to re-reporting of the inaccuracies on the consumer's credit reports.

117.     Upon information and belief, Defendants have a deliberate policy of refusing consumers' requests to remove inaccurate, derogatory, and misleading information from their credit reports. As a result, the credit reports of these individuals and of all Class Members incorrectly show an indebtedness to Defendants as legally collectible.

118.     Upon information and belief, even in response to notices made pursuant to the FCRA §1681i(a)(2), from Class Members that information contained in their credit reports was inaccurate, Defendants  have refused to correct erroneous credit information despite their affirmative duty to do so under FCRA §1681s-2(b).

119.     Upon information and belief, Defendants also received many requests from the CRAs that Defendants verify that the debts owed by Plaintiff and Class Members were discharged in bankruptcy, to which Defendants responded that the debts were still due and owing, despite Defendants' knowledge that such debts have in fact been discharged in bankruptcy.

120.     Defendants know that the existence of such inaccurate information in the Class Members' credit reports damages the Class Members' credit ratings and their ability to obtain new

credit, a lease, a mortgage or employment, all of which may be essential to reestablishing their life after going through bankruptcy.

121.   Defendants choose not to advise the CRAs of the fact that the Class Members' debts have been discharged because Defendants continue to receive payment either directly or indirectly on discharged debts. This results from the fact that Class Members, in order to obtain favorable credit or credit at all, often feel it necessary to pay off the debt despite its discharge in order to remove the inaccurate information from their credit reports.

122.   This belief is intentionally reinforced by Defendants themselves when Class Members contact Defendants asking Defendants to correct the erroneous credit information. Not only do Defendants refuse to make such corrections, but they advise Class Members that, so long as the discharged debt remains unpaid, the misleading information will remain on their credit report.

123.   Thus, when Class Members need to rent a car, obtain employment, rent an apartment, or other similar transactions, and they are advised by Defendants that they will not remove the erroneous information unless they pay the debt, Class Members often pay that debt despite the fact that it has been discharged in bankruptcy. Accordingly, Defendants know they are obtaining payments on debts that have been discharged in bankruptcy.

124.   Class Members believe they must pay these debts in order to remove them from their credit reports because they are often advised prior to bankruptcy by Defendants and collection agencies that, if their debt is reported on their credit report, it will dramatically affect their credit rating and will severely impact their ability to receive credit in the future.

125.   Defendants have adopted a systematic pattern and practice of failing and refusing to update credit information with regard to debts discharged in bankruptcy because they sell those debts and profit by the sales. Defendants know that if the credit information is not updated, then many Class Members will feel compelled to pay off the debts even though they are discharged in bankruptcy. Thus, buyers of Defendants debts know, and are willing to pay more for the fact that,

they will be able to collect portions of Defendants' debts despite the discharge of those debts in bankruptcy.

126.    Upon information and belief, Defendants receive a percentage fee of the proceeds of each debt repaid to the buyer of Defendants' debts. Defendants therefore have a clear economic incentive to violate the FCRA.

127.    Buyers of Defendants consumer debts that have been sold by Defendants prior to a bankruptcy being filed know that, post-sale, Defendants will refuse to correct the credit report to reflect the consumer's bankruptcy discharge, which means that the consumer will feel significant added pressure to obtain a "clean" report by paying on a discharged debt.

128.    Class Members' discharged debts that have been sold or transferred fail to identify the purchaser. Therefore, as far as the consumer is concerned, the only creditor to approach to correct the credit reports is Defendants, who, as a matter of policy, refuse to correct them. While, in addition, retaining a percentage of payments sent to Defendants by the consumers, as opposed to Defendants' undisclosed buyer. This highlights further the perniciousness of Defendants' systematic approach in refusing to correct such reports.

129.    Defendants' actions also constitute violations of 11 U.S.C. § 524(a)(2), which provides that a discharge in bankruptcy operates as an injunction against the commencement or continuation of an action, the employment or process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor.

130.    Thus, Credit Reporting for the purpose of collecting on discharged debt is a violation of the Bankruptcy discharge injunction. See e.g., *Rivera v. Bank One*, 145 F.R.D. 614, 623 (D.P.R. 1993) (a creditor's report of a debt to a consumer reporting agency is a "powerful tool, designed, in part, to wrench compliance with payment terms"); *Mahoney v. Washington Mutual, Inc.* (*In re Mahoney*), 368 B.R. 579 (Bankr. W.D. Tex. 2007) (reporting a discharged debt constitutes an "act" to collect the debt in violation of the discharge injunction if the evidence shows there is a linkage between the act of reporting and the collection or recovery of the discharged

debt); *Montano v. First Light Fed. Credit Union* (*In re Montano*), 488 B.R. 695, 710 (Bankr. D. N.M. 2013) (reporting discharged debt violates the discharge injunction if its objective effect was to pressure the debtor into paying the discharged debt); *Russell v. Chase Bank USA* (*In re Russell*), 378 B.R. 735, 742 (Bankr. E.D.N.Y. 2007) (reporting a discharged debt violates the discharge injunction if done for the purpose of coercing payment); *Lohmeyer v. Alvin's Jewelers* (*In re Lohmeyer*), 365 B.R. 746, 750 (Bankr. N.D. Ohio 2007) (same); *Smith v. Am. Gen. Fin. Inc.* (*In re Smith*), 2005 Bankr. LEXIS 2481, 2005 WL 3447645, at *3 (Bankr. N.D. Iowa Dec. 12, 2005) (Credit report notation is a violation of the discharge injunction if made with the intent to collect a debt; *Vogt v. Dynamic Recovery Servs.* (*In re Vogt*), 257 B.R. 65, 71 (Bankr. D. Colo. 2000) (false credit reporting, if done to extract payment of the debt, is an act proscribed by the Code).

131.    Accordingly, Defendants  violated the FCRA by failing to comport their credit reporting with the terms of the Bankruptcy Discharge under §§ 727 and 524(a)(2) of the Bankruptcy Code, which ultimately intentionally assisted in the collection of discharged debt by not correcting the Class Members' credit reports to reflect that the debt has, in fact, been discharged.

132.    Defendants' reporting was inaccurate and materially misleading due to the effect of Plaintiff's successful Bankruptcy Discharge, because:

> "The failure to update a credit report to show that a debt has been discharged is also a violation of the discharge injunction if shown to be an attempt to collect the debt. Because debtors often feel compelled to pay debts listed in credit reports when entering into large transactions, such as a home purchase, it should not be difficult to show that the creditor, by leaving discharged debts on a credit report, despite failed attempts to have the creditor update the report, is attempting to collect the debt."[3]

133.    Defendants' conduct is in bad faith, is vexatious and oppressive and is done with full knowledge that they are in violation of the law.

---

[3]Collier on Bankruptcy, paragraph 524.02[2][B] (16th Ed. 3 2013), at page 524-23.

134.    As a result of a major class action settlement, the CRAs have agreed to revise their procedures to report all pre-bankruptcy debts as discharged, unless furnishers provide information showing that a debt was excludable from discharge. *White v. Experian Info Solutions, Inc.*, Case No. CV 05-01070 (C.D. Cal. Aug. 19, 2008) (lead case number).

135.    Hence, even the CRAs acknowledged that the accurate and proper way to report the status of all pre-bankruptcy debts, like Plaintiff's and Class Members' debts, following successful Bankruptcy discharges of the debt, is "Discharged in Bankruptcy" (or the equivalent).

136.    Therefore, Defendants' persistent refusal to provide updated credit information to the CRAs that Class Members' debts are no longer "current," "open," "charged off," or "past due" because they have been discharged in bankruptcy constitutes knowing and willful violations of the FCRA.

137.    Defendants have also directly collected on debts that Plaintiff and Class Members discharged in bankruptcy.

### FIRST CAUSE OF ACTION

### Violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, et seq.
### (On Behalf of Plaintiff and All Class Members)

138.    Plaintiff repeats, re-alleges, and incorporates by reference all above paragraphs.

139.    Defendants failed to reference the bankruptcy filing and discharge in the CII field in Plaintiff's Trans Union and Experian Credit Reports with respect to Plaintiff's accounts successfully discharged through Plaintiff's bankruptcy.

140.    Instead, Defendants reported that the status of the debts were "current" and reflecting owed balances, i.e. still legally collectable, as opposed to "Discharged in Bankruptcy."

141.    The status reported by Defendants, as opposed to the correct status of "Discharged in Bankruptcy," inaccurately and misleadingly suggests that Plaintiff still has a personal legal liability to pay the alleged Debts, which is the opposite effect of receiving a bankruptcy discharge.

142.   A "materially misleading" statement is concerned with omissions to credit entries, that in context create misperceptions about what otherwise may be factually accurate data. *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009).

143.   In or around July 7, 2022, Plaintiff disputed the inaccurate reporting pursuant to 15 U.S.C. § 1681i, by notifying Trans Union and Experian, in writing, of the inaccurate, misleading, and derogatory information.

144.   Specifically, Plaintiff sent a pair of letters, certified, return receipt, to Trans Union and Experian, requesting the above inaccurate information be updated, modified, or corrected.

145.   Upon information and belief, the CRA's timely notified Defendants of Plaintiff's disputes.

146.   Defendants were required to conduct a reasonable investigation into the specific accounts on Plaintiff's and the Class' consumer reports pursuant to 15 U.S.C. § 1681s-2(b)(1)(A).

147.   Upon information and belief, Defendants' investigation of Plaintiff's and the Class' disputes was unreasonable. More specifically, Defendants, should have discovered from their records, including Plaintiff's and the Class' dispute letters and the bankruptcy records that were publicly available to Defendants, that the information Defendants were reporting was patently inaccurate and materially misleading.

148.   A reasonable investigation would have also led to Defendants consulting with the CRRG's Metro 2 instructions to determine the accurate and proper reporting of the current status of the accounts, which would have revealed that Defendants should have reported the status as "Discharged in Bankruptcy."

149.   However, following Defendants' FCRA investigations, there was no notation, status update, or any other indication in the tradelines that the accounts were discharged in Plaintiff's and the Class' Bankruptcies.

150.   Accordingly, Defendants failed to conduct a reasonable investigation with respect to the disputed information as required by 15 U.SC. § 1681s-2(b)(1)(A) by failing to remove and/or correct the disputed and incorrect information.

151.   Defendants failed to review all relevant information provided by Plaintiff and the Class Members, as required by and in violation of 15 U.SC. § 1681s-2(b)(1)(B).

152.   Due to Defendants' failure to reasonably investigate, they further failed to correct and update Plaintiff's and the Class' information as required by 15 U.S.C. § 1681s-2(b)(1)(E), thereby causing continued reporting of inaccurate information in violation of 15 U.S.C. § 1681-s(2)(b)(1)(C).

153.   Plaintiff's and the Class' continued efforts to correct Defendants' erroneous and negative reporting of the accounts by communicating their disputes with Defendants were fruitless.

154.    Defendants' continued inaccurate and negative reporting of the Accounts in light of their knowledge of the actual errors was willful.

155.   By inaccurately reporting account information relating to the accounts after notice and confirmation of their errors, Defendants failed to take the appropriate measures as determined by 15 U.S.C. §§ 1681-s(2)(b)(1)(D) and (E).

156.   The foregoing acts and omissions constitute numerous and multiple willful, reckless, or negligent violations of the FCRA, including, but not limited to, each and every one of the above-cited provisions of the FCRA, 15 U.S.C. § 1681.

157.   Plaintiff and the Class Members were (and continue to be) damaged as a direct and proximate result of Defendants' unlawful conduct including without limitation, fear of credit denials, out-of-pocket expenses in challenging the inaccurate reporting, damage to their creditworthiness, emotional distress, loss of privacy, and other economic and non-economic harm, for which they are entitled to compensation.

158.   As a result of each and every willful violation of the FCRA, Plaintiff and the Class are entitled to actual damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(1);

statutory damages pursuant to 15 U.S.C. § 1681n(a)(1); punitive damages as the Court may allow, pursuant to 15 U.S.C. § 1681n(a)(2); and reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1681n(a)(3) from Defendants.

## SECOND CAUSE OF ACTION

### Unjust Enrichment
### (On Behalf of Plaintiff and All Class Members)

159.    Plaintiff repeats, re-alleges, and incorporates by reference all above paragraphs.

160.    Plaintiff and the Class Members were (and continue to be) damaged as a direct and proximate result of Defendants' unlawful conduct including without limitation, collecting funds that were discharged in bankruptcy.

161.    Plaintiff and Class Members are therefore entitled to damages, including restitution and unjust enrichment, disgorgement, declaratory and injunctive relief, and fees and costs of litigation.

## THIRD CAUSE OF ACTION

### Bankruptcy Discharge Injunction violations under 11 U.S.C. § 524
### (On Behalf of Plaintiff and All Class Members)

162.    Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

163.    For the reasons stated in more detail above, it was unlawful and a violation of the bankruptcy discharge injunction for Defendants to continue to collect from Plaintiff and the Class on accounts that were discharged in bankruptcy.

164.    By knowingly and willfully collecting from Plaintiff and the Class on accounts that had been discharged in bankruptcy, Defendants were noncompliant with 11 U.S.C. §§ 524(a)(2) and 727 of the Bankruptcy Code.

165.    The foregoing acts and omissions constitute numerous and multiple willful, reckless, or negligent violations of § 524 of the Bankruptcy Code.

166.    Plaintiff and Class Members have been damaged by Defendants' conduct and therefore seek an award of sanctions, a declaration that Defendants violated 11 U.S.C. § 524(i), injunctive relief, and all appropriate damages and other recovery, including but not limited to actual damages, punitive damages, and attorneys' fees and costs pursuant to the Court's inherent powers and its statutory 11 U.S.C. § 105(a) powers for Defendants' gross violations of the discharge injunction and orders of the Bankruptcy Courts.

## FOURTH CAUSE OF ACTION

**Violation of The Nevada Deceptive Trade Practices Act NRS 598 et seq. (NDTPA),
Constituting "Consumer Fraud" Under NRS 41.600 et seq.
(On Behalf of Plaintiff and the Nevada Class)**

167.    Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

168.    Through the aforementioned conduct, Defendants violated NRS 598.0915(15) by knowingly making false representations regarding Plaintiff's and the Nevada Class' legal rights and obligations regarding the discharged debts, and by taking legal action Defendants were not entitled to take to collect the alleged debts.

169.    Through this conduct, Defendants violated NRS 598.0923(1)(c) by violating the NDTPA, a Nevada statute.

170.    Pursuant to NRS 41.600(2)(e), Defendants' illegal attempts to collect the discharged debts from Plaintiff and the Nevada Class, in violation of NRS 598.0923(1)(c) and NRS 598.015(15), constitute "consumer fraud."

171.    The foregoing acts and omissions constitute numerous and multiple violations of the NDTPA.

172.    As a result of each and every violation of the NDTPA, Plaintiff is entitled to any damages sustained, pursuant to NRS 41.600(3)(a); and reasonable attorney's fees and costs pursuant to NRS 41.600(3)(b) from Defendants.

## PRAYER FOR RELIEF

173.   Wherefore, Plaintiff, individually and on behalf of the other members of the Class proposed in this complaint, respectfully requests that the Court enter judgement in favor of Plaintiff and the Class as follows:

- Certifying this action as a class action, with a class as defined above;
- An award of actual damages, in an amount to be determined at trial or damages of a maximum of $1,000 pursuant to 15 U.S.C. § 1681n(a)(1)(A), against Defendants for each incident of willful noncompliance of the FCRA;
- An award of punitive damages, as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(2), against Defendants for each incident of willful noncompliance to the FCRA;
- An award of actual damages in an amount to be determined at trial pursuant to 15 U.S.C. § 1681o(a)(1) against Defendants for each incident of negligent noncompliance of the FCRA;
- An award of costs of litigation and reasonable attorney's fees pursuant 15 U.S.C. § 1681n(a)(3) and 15 U.S.C. § 1681o(a)(2) against Defendants for each incident of noncompliance of the FCRA;
- For equitable relief enjoining Defendants from engaging in the wrongful acts and omissions complained of herein pertaining to the reporting of derogatory, misleading, and inaccurate information on consumers' credit reports;
- Awarding compensatory damages to redress the harm caused to Plaintiff and Class Members in the form of, *inter alia*, unjust enrichment;
- Actual damages, punitive damages, and attorneys' fees and costs pursuant to the Court's inherent powers and its statutory 11 U.S.C. § 105(a) powers for Defendants' gross violations of the discharge injunction and orders of the Bankruptcy Courts; and
- Awarding Plaintiff and the Class such other and further relief as this

Court deems just and proper.

## TRIAL BY JURY

174.     Pursuant to the seventh amendment to the Constitution of the United States of America and the Constitution of the State of Nevada, Plaintiff is entitled to, and demands, a trial by jury.

DATED this 28th day of September 2022.


Respectfully submitted,


**FREEDOM LAW FIRM**

/s/ Gerardo Avalos
George Haines, Esq.
Gerardo Avalos, Esq.
8985 South Eastern Ave., Suite 350
Las Vegas, NV 89123

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**

Scott C. Harris*
N.C. Bar No: 35328
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5003
Facsimile: (919) 600-5035
sharris@milberg.com

Gary M. Klinger*
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866.252.0878
gklinger@milberg.com

*to motion for appearance *pro hac vice*

*Attorneys for Plaintiff and on behalf of all others similarly situated*